UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

JULIA RAMOS,                                        :
                                                    :
                        Plaintiff,                  :
                                                    :
        -v-                                         :
                                                    :
COMMISSIONER OF SOCIAL                              :
SECURITY,                                           :
                                                    :
                        Defendant.                  :

-----------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED:  08/13/2024

**OPINION AND ORDER**

23-CV-9897 (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

Julia Ramos commenced this action against the Commissioner of the Social Security Administration seeking review of a decision finding her ineligible for Social Security Disability ("SSD") benefits and Supplemental Security Income ("SSI") benefits, pursuant to Titles II and XVI of the Social Security Act. Ramos has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Ramos's motion is denied.

## I.    BACKGROUND

### A. Procedural History

On April 7, 2021 and April 8, 2021, Ramos filed applications for both SSD and SSI benefits, alleging a disability onset date of March 31, 2020. Administrative Record ("AR") at 11, Dkt. No. 17.[1] The Social Security Administration ("SSA") denied these applications first on June 16, 2021, and again upon reconsideration on

---

[1] When referring to page numbers in the Administrative Record, the Court uses the page numbers in the bottom right of each page, not the automatic number generated by the Electronic Case Filing system.

August 2, 2021.  *Id.*

Ramos then requested a hearing before an Administrative Law Judge ("ALJ").  *Id.*  On November 17, 2021, an ALJ held a telephone hearing, but it was adjourned for Ramos to obtain representation.  *Id.*  On February 9, 2022, assisted by a non-attorney representative, Ramos attended and testified at a hearing before ALJ Lori Romeo.  *Id.* at 227–65.[2]  The hearing took place by telephone due to the extraordinary circumstances presented by the COVID-19 pandemic.  *Id.* at 11.  In a decision dated May 26, 2022, the ALJ denied Ramos's claims, finding her not to be disabled from the alleged onset date of March 31, 2020 through the date of the decision.  *Id.* at 26.  The Appeals Council denied review on September 27, 2023.  *Id.* at 1.

Ramos timely commenced this action on November 8, 2023, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383 (c)(3).  Complaint, Dkt. No. 1.  On February 6, 2024, the Commissioner answered Ramos's complaint by filing the administrative record.  Dkt. No. 17.  On May 8, 2024, Ramos, represented by counsel, moved for judgment on the pleadings, and submitted a memorandum of law ("Pl. Mem.") and a declaration of Meghan Agostinelli ("Agostinelli Decl.") in support of the motion.  Dkt. Nos. 20–22.  The Commissioner then filed a brief opposing Ramos's motion on July 8, 2024.  Commissioner's Brief in Opposition to Plaintiff's Request for Review ("Def. Mem.").

---

[2] Ramos was represented during the hearing by paralegal Blanca Quintanilla from the New York Legal Assistance Group.  AR at 229, 556.

Dkt. No. 24.  Ramos submitted a reply on July 22, 2024.  Reply Memorandum of Law in Further Support ("Pl. Reply"), Dkt. No. 25.

The parties have consented to my jurisdiction for all purposes.  Dkt. No. 14.

### B. The Administrative Record

#### 1. Ramos's Background

Ramos was born on October 27, 1986.  AR at 234.  At the time of the hearing, Ramos was 35 years old.  *Id.*  Ramos has a college degree.  *Id.*  She previously worked as a teacher and a secretary.  *Id.* at 255–57.  Ramos is a single parent to two sons who were 13 and 3 at the time of the hearing.  *Id.* at 234–35.  Ramos lives in Manhattan.  *Id.* at 67.

Ramos contends that she suffers from various medical impairments that render her unable to work.  First, Ramos received a "presumed covid" diagnosis on April 24, 2020.  *Id.* at 780.  Ramos was diagnosed with a pulmonary embolism on August 29, 2020.  *Id.* at 532.  After complaining of various symptoms, including chronic fatigue, brain fog, shortness of breath, and others, Ramos was diagnosed with post-viral fatigue syndrome and a dysfunctional autonomic nervous system. *Id.* at 741–43.  Ramos was prescribed Propranolol and Eliquis for her symptoms, which were helpful.  *Id.* at 679, 1089.  Ramos was later diagnosed with long COVID. *Id.* at 1734.  Between her diagnosis and the hearing, Ramos continued to experience a variety of symptoms associated with this diagnosis.  *Id.* at 584, 685, 1566, 1571, 1741.

Ramos next argues that she suffers from bilateral carpal tunnel syndrome.

*Id.* at 235–36.  Ramos was first diagnosed with carpal tunnel syndrome in August 2019, and on November 6, 2020, Ramos sought medical treatment for this condition because her condition had been worsening.  *Id.* at 728, 1217.  She testified that this condition makes it difficult to carry groceries, to write for more than three to five minutes, or to open jars.  *Id.* at 247–49.

There are three other medical conditions that Ramos argues have contributed to her inability to work.  First, Ramos began to experience pelvic pain and endometriosis in or around March 2020.  *Id.* at 686.  In April 2021, Ramos was diagnosed with adenomyosis and likely tricompartmental deep pelvic endometriosis.  *Id.* at 681.  Second, Ramos was diagnosed with degenerative disc disease following an x-ray on October 15, 2021, and an MRI on November 9, 2021.  *Id.* at 1474, 1604–08.  She testified that she can only sit for one hour, must change position every 10 to 15 minutes, can only stand for an hour, can only walk for about 10 blocks, and has difficulty stooping, kneeling, and crouching.  *Id.* at 243, 249.  Finally, Ramos suffers from major depressive disorder and generalized anxiety disorder.  *Id.* at 574–76.  She attends therapy for these conditions.  *Id.*

### 2.  Relevant Medical Evidence

In her moving papers, Ramos provided a summary of the medical evidence contained in the administrative record.  *Id.* at 2–11.  The Commissioner also provided a summary of the same.  Def. Mem. at 1–6.  Having examined the record, the Court adopts the parties' summaries as accurate and complete for purposes of the issues raised in this action.  *See, e.g., Thomas v. Saul*, No. 19-CV-6990 (MKV)

(RWL), 2020 WL 5754672, at *1 (S.D.N.Y. July 24, 2020) (adopting parties' medical opinion summaries), *adopted sub nom. Thomas v. Comm'r of Soc. Sec.*, 2020 WL 4731421 (Aug. 14, 2020).

The Court will discuss the medical evidence pertinent to the adjudication of this case in section II.B of this opinion.

### 3. ALJ Hearing

Ramos appeared telephonically before ALJ Romeo on February 9, 2022. AR at 229. Ramos's representative began by indicating that she was still waiting for some outstanding medical records. *Id.* at 232–33. The ALJ granted Ramos an additional 60 days to complete the record. *Id.* at 233.

ALJ Romeo then began to question Ramos. *Id.* at 234. Ramos was first asked to confirm some biographical information relating to her age and family. *Id.* at 234–35. The ALJ then stated her understanding of the conditions that prevented Ramos from working after March 2020: "you have a BMI of 34, you had a pulmonary embolism, you've had asthma, you had pericarditis, you have endometriosis, you have tachycardia, you have bilateral carpal tunnel syndrome and you're alleging the long-term effects from COVID including a neurological cognitive disorder, depression and anxiety." *Id.* at 235–36. The ALJ then asked if there are any other diseases that would prevent her from working. *Id.* at 236. Ramos replied that she was diagnosed with early Sjogren's syndrome, tested positive for Epstein Barr virus, and has post-viral arthritis. *Id.*

The ALJ next asked Ramos about her COVID diagnosis and symptoms.

Ramos explained that she had never tested positive for COVID or for having the antibodies for COVID. *Id.* at 236–37. As a result of this response, the ALJ cautioned Ramos's representative: "I don't know if you could establish a COVID diagnosis . . . without a positive test or a positive antibody test." *Id.* at 237.

ALJ Romeo then asked Ramos how these conditions had affected her ability to handle her activities of daily living. *Id.* Ramos explained that she can dress herself but must sit to put her shoes on. Ramos testified that she could only dress her three-year-old son while sitting, as it causes her pain and sometimes triggers tachycardia. *Id.* at 238. Ramos can do some cooking and cleaning but has had to make modifications such as having more frozen meals or changing the type of mop she used. *Id.* at 238–39. Ramos stated that she generally walks or takes medical transportation to her appointments, though sometimes she takes the bus. *Id.* at 239–40.

Ramos was then asked about her recent travel history. She testified that she had visited Costa Rica for two weeks and Virginia for five or six days. *Id.* at 240.

The ALJ asked Ramos to describe any pain she experiences from "the top of your head to the bottom of your feet[.]" *Id.* at 241. Ramos replied that she has headaches, eye pain, dry mouth, neck and back pain, as well as stiffness in her knees and ankle. *Id.* Ramos testified that the pain fluctuates, but on average is 'between a six and a seven" each day on a zero to ten pain scale with ten being the highest level of pain. *Id.* Ramos stated the pain is worse when she overextends herself. *Id.*

6

ALJ Romeo questioned Ramos about what she meant by overextending herself and how long she can sit or stand. *Id.* at 242–43. Ramos responded that if she does something like picking up her toddler, that is "always a bad decision." *Id.* at 242. Ramos testified that when seated she must "rotate every ten to 15 minutes" because of lower back pain, and that she could sit or stand for up to an hour in total. *Id.* at 242–43. She also stated that she can walk ten blocks and does not use any assistive devices for walking. *Id.* at 243.

The ALJ then asked Ramos about the medications that she takes for pain. *Id.* Ramos replied that she takes a high dosage of Aleve and medical marijuana. *Id.* After the ALJ pointed out a mismatch between Ramos's testimony and her submitted medications list, Ramos's representative stated that she would submit an updated list. *Id.* The ALJ noted that the existing list showed that Ramos was taking medication for blood clots, tachycardia, anxiety, and other issues, and Ramos clarified that she was no longer using Eliquis for blood clots. *Id.* at 244. Ramos also testified that she was referred for physical therapy and acupuncture but was waiting for insurance approval before beginning. *Id.* at 244–45. Ramos recalled attending about two months of physical therapy in 2021, which helped "[a] little bit." *Id.* at 245.

ALJ Romeo then questioned Ramos about her mental health treatment. *Id.* Ramos testified that she was seeing a therapist weekly and a psychiatrist as needed. *Id.* She claimed that she has had depression and anxiety since getting sick and has struggled with brain fog. *Id.* Ramos testified that she has had difficulty

being comfortable around people, explaining that part of this relates to anxiety around COVID, and part of this is because Ramos's brain fog makes it more common that she feels disoriented.  *Id.* at 246.

Finally, the ALJ asked Ramos if she had any other conditions that would affect her ability to work.  *Id.*  Ramos replied that she has struggled to multitask and have stamina since getting sick, but these skills are necessary to be a teacher. *Id.* at 246–47.  Most days, Ramos stated that she needs to nap for about an hour while her children are at school.  *Id.* at 247.

Ramos's representative then questioned her.  *Id.* at 247.  Ramos testified that she has carpal tunnel in her hands and a burning sensation in her back.  *Id.*  These conditions cause her difficulty in opening jars or writing.  *Id.*  Ramos explained that she has problems opening a jar more than half the time and can only write for three to five minutes at a time.  *Id.* at 248.  Ramos also indicated that she cannot carry two bags of groceries and must either go with her older son or buy only lighter groceries.  *Id.* at 248–51.

Ramos also testified that she has difficulty stooping, kneeling, or crouching, as it causes back pain.  *Id.* at 249.  Ramos stated she can walk one full flight of stairs without taking a break.  *Id.* at 249–50.  As for her brain fog, Ramos testified that she experiences this symptom a few times a week, and the duration of this symptom can vary.  *Id.* at 250.  Ramos also testified that she is able to do her laundry, but sometimes has back pain when doing so.  *Id.*

Elaine Cogliano, a Vocational Expert ("VE"), also testified at the hearing.  *Id.*

at 251.  Specifically, the VE testified about the jobs performed by Ramos in the last 15 years.  *Id.* at 255–57.  The ALJ asked the VE a hypothetical for a person with a college education and the same past work history as Ramos, but who is "limited to light work except they could only frequently grasp, finger and feel . . . can work indoors exposed to normal indoor temperatures . . . they can occasionally stoop and occasionally climb stairs . . . [and] should do work that requires little or no judgment[.]"  *Id.* at 258.  The VE agreed with the ALJ that such a hypothetical individual could not perform any of Ramos's past jobs.  *Id.*  However, the VE stated that an individual subject to the circumstances of this hypothetical could be a "sorter," a "price marker/ticket marker," or a "small parts assembler."  *Id.* at 259.

The ALJ then adjusted the hypothetical for the VE, asking the same question but in a circumstance where the individual was limited to only sedentary work.  *Id.* at 260.  The VE responded that such an individual in these conditions could be a "document preparer," a "table worker," or an "assembler."  *Id.* at 260–61.  The VE further explained that an employer will only tolerate 10% of an unskilled worker's time as "off task," and "anything more than that all work would be eliminated in the national economy."  *Id.* at 261.  Ten percent of each day is approximately five or six minutes each hour, plus two 15-minute breaks and a lunch break.  *Id.* at 261–62.  The VE testified that an employer will only tolerate one day of absenteeism for an employee in an unskilled position each month, and anything more than that would eliminate all work in the national economy.  *Id.* at 262.  Additionally, the VE testified that there would be no jobs in the national economy if an individual were

limited to sedentary work and only occasional fingering.  *Id.*

Ramos's representative then asked the VE to confirm that if someone were more than 10% off task during the workday, it would eliminate all work in the national economy.  *Id.* at 263.  The VE agreed.  *Id.*  Ramos's representative did not ask additional questions of the VE.

The ALJ then closed the proceeding, reiterated that she needed an updated medications list, and asked for Ramos's representative to point out her grip and grasp testing results.  *Id.* at 264.[3]

### 4.  The ALJ's Decision

The ALJ denied Ramos's application in a 16-page decision on May 26, 2022. *Id.* at 11–26.  In the decision, she concluded that Ramos was not "under a disability within the meaning of the Social Security Act from March 31, 2020, through the date of [the] decision."  *Id.* at 12.

Following the five-step test set forth in the SSA regulations, the ALJ first determined that Ramos had "not engaged in substantial gainful activity" since March 31, 2020, the alleged onset date of her disability.  *Id.* at 14.

At the second step, the ALJ determined that Ramos has the following severe impairments: "obesity, major depressive disorder, endometriosis, status post pulmonary embolism, asthma, thyroid disorder, tachycardia, pericarditis, migraine

---

[3] In a letter to ALJ Romeo dated April 5, 2022, Ramos's representative stated "the record is complete and the case is now ready for a decision" and pointed out test results in the record that explained Ramos's grip and grasping issues.  AR at 554–55.

headache disorder, degenerative disc disease of the cervical and lumbar spine, sacroiliitis, and carpal tunnel syndrome." *Id.* While the ALJ considered Ramos's diagnosis with a cognitive impairment, she ultimately determined that this condition was "non-severe" because Ramos was "attentive, pleasant, and cooperative," during a neurological evaluation, and had "fair recent and remote memory, and attention" based on the results of a mental status exam. *Id.*

At the third step, the ALJ determined that Ramos's impairments did not "meet[] or medically equal[] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." *Id.* at 15. The ALJ then assessed each of Ramos's impairments. *Id.* at 15–18.

The ALJ first determined that Ramos did not meet or equal the listings for several of her impairments. The ALJ found that Ramos did not meet the listings for "disorder of the skeletal spine" or "lumbar spinal stenosis" based on imaging results, the lack of evidence regarding Ramos's need for a walker, canes, or crutches, and Ramos's inability to use her upper extremities. *Id.* at 15. The ALJ next determined that Ramos did not meet the criteria regarding asthma based on the severity of her symptoms and because her asthma did not require three hospitalizations within a 12-month period at least 30 days apart. *Id.* at 15–16. The ALJ then considered whether Ramos's obesity or headache disorder met or were equal to any listing, but determined based on the signs, symptoms, and laboratory findings that these were not. *Id.* at 16. The ALJ similarly found that Ramos did not meet the listing for

"abnormality of a major joint(s)" because there was no medical documentation of a need for a walker or similar device or evidence of an inability to use both upper extremities. *Id.* Ramos did not meet the listing for "recurrent arrhythmias," and although the ALJ acknowledged that Ramos had complained of a racing heartbeat, she clarified that the record showed these complaints came in the context of exercising. *Id.* Finally, the ALJ determined that Ramos's mental impairment did not meet the listing because she did not have either one extreme limitation or two marked limitations in a broad area of functioning. *Id.* at 16–17.

The ALJ then determined that Ramos had a "moderate limitation" in "understanding, remembering, or applying information." *Id.* at 17. While Ramos testified that she suffered from brain fog and similar symptoms, the ALJ observed that she appeared "fully oriented" during cognitive testing and had "fair recent remote memory, and attention." *Id.* Therefore, "[o]n balance, the claimant has moderate limitation [in this category]."

The ALJ also determined that Ramos had a moderate limitation in "interacting with others." While Ramos's testimony and the record indicate that Ramos had some issues "getting along with her mother and ex-boyfriend" and "did not like to be around people," Ramos was also able to travel via public transportation and get along with her son. *Id.*

The ALJ next found that Ramos had a moderate limitation in "concentrating, persisting, or maintaining pace." *Id.* While she noted that Ramos testified about problems performing daily activities, the ALJ also observed that Ramos is "able to

cook simple meals, attend the gym, and take care of her young son." *Id.*

The ALJ further found that Ramos had a moderate limitation "adapting or managing" herself. *Id.* Although she testified about her need for naps and help from her older son to complete activities, as well as her brain fog, the ALJ noted that Ramos also testified that she had no problems engaging in personal care such as getting dressed, could prepare simple meals, take care of her younger son, clean the house, and go to the gym. *Id.*

The ALJ also determined that "paragraph C" criteria were not satisfied because the "record does not establish that the claimant has only marginal adjustment . . . [and] [t]here is no evidence that changes or increased demands have led to exacerbation of the claimant's symptoms and signs and to deterioration in the claimant's functioning." *Id.* at 18.

At the fourth step, the ALJ found, based on "careful consideration of the entire record," that Ramos had "the residual functional capacity" ("RFC") to:

> [P]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is limited to frequent grasp, finger, and feel. She can work indoors exposed to normal indoor temperatures, wetness, and respiratory irritants. She can occasionally stoop and climb stairs. She is limited to work that requires little or no judgment to do simple duties that a person can learn on the job in a short period of time (i.e., 30 days or less) . . . She is limited to low stress jobs defined as only occasional decision making and only occasional changes in work setting. Lastly, she can have only occasional interaction with the public and coworkers[.]

*Id.*

The ALJ determined that Ramos's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the

claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* at 19.

The ALJ then discussed Ramos's alleged ailments stemming from COVID-19. The ALJ noted that "the record did not indicate a positive COVID test or positive anti-body test." *Id.* Nevertheless, the ALJ assessed each of the complaints in the record that were alleged to stem from Ramos's COVID.

The ALJ considered Ramos's complaints of chest pain and shortness of breath, which caused her to visit the emergency department. *Id.* The ALJ also observed that on May 29, 2020, Ramos "reported improved chest pain," that "she was active and exercised regularly," and that she denied symptoms of chest pain, shortness of breath, or other related symptoms. *Id.* Dr. Geoffrey Webber, one of her treating physicians from the NYU Langone Health System, had recommended that Ramos exercise vigorously and regularly. *Id.* at 20, 1133.[4]

The ALJ next discussed that Ramos "presented to the emergency department with chest pain and increased heart rate" on August 30, 2020, and an "EKG revealed sinus tachycardia." *Id.* The ALJ described that the "echocardiogram was generally within normal limits" but that Ramos "received a diagnosis of pulmonary embolism." *Id.* After that, Ramos "presented to the pulmonary clinic at NYU with complaints of fatigue, rapid heart rate, myalgia, and follow-up treatment for

_____

[4] The ALJ incorrectly referred to Dr. Geoffrey Webber as Dr. Geoffrey Weaver in her opinion.

pulmonary embolism," but that a "September 2020 pulmonary/chest exam was normal" and "[o]ne month later, she had normal exam findings." *Id.*

The ALJ then reviewed Ramos's psychiatric treatment records. *Id.* While the ALJ noted Ramos's "complaints of anxiety, depression, and problems with housing, and difficulty getting along with her mother and ex-boyfriend," she also explained that "[i]n January 2021, the claimant presented with normal speech, motor activity, affect, and thought processes." *Id.* Furthermore, "in April 2021, the claimant reported feeling better . . . she reported that therapy was very helpful alleviating mood swings and anxiety." *Id.* In July 2021, Ramos still "exhibited full affect, good hygiene, cooperative behavior, and normal thought content" and "reported going on vacation to Costa Rica." *Id.*

The ALJ then returned to discussing Ramos's pulmonary complaints. *Id.* at 21. While the ALJ noted that Ramos complained of "some post-exercise malaise," she also "had no chest discomfort, shortness of breath, palpitations, or tachycardia." *Id.* Ramos "reported continued fatigue and increased heart rate" but "was able to ride a bike, do strength training, and walk 2 miles a day." *Id.* Further, following Ramos's complaints in March 2021 of "fatigue, exercise intolerance, myalgia, word finding difficulties, occasional headaches, shortness of breath, and tachycardia" a physical exam "revealed full strength in the upper and lower extremities, intact deep tendon reflexes, and normal gait" as well as "normal mood, affect, and judgment, and she was able to sit/stand transfer without difficulty." *Id.* "A follow-up physical, neurological, and pulmonary exam noted normal findings." *Id.*

The ALJ explained that Ramos "continued to report fatigue, migraine headache, and muscle pain" but "had normal physical exam findings." *Id.* After Ramos complained of fatigue, joint pain, low back pain, and headaches on August 31, 2021, an exam revealed "full motor strength in the bilateral upper extremities" and an x-ray demonstrated "no acute fracture or dislocation." *Id.* However, a "follow-up MRI of the sacroiliac joints noted mild active sacroiliitis" and a "cervical spine x-ray revealed degenerative disc disease." *Id.* The ALJ considered that [f]ollow-up MRIs demonstrated cervical disc disease most pronounced at C5–6," but that "[d]espite these findings . . . [Ramos] reported that she attended classes at the city gym . . . [and] physical exams through January 2022[] consistently revealed normal gait, full strength, and intact sensation . . . and full range of motion[.]" *Id.* at 22.

The ALJ then considered Ramos's complaints of pelvic pain and noted that she was diagnosed with endometriosis. *Id.* The ALJ observed that Ramos "made good progress in [physical] therapy but stopped due to childcare issues." *Id.* The ALJ noted that Ramos "underwent medical management with Mirena IUD and progesterone therapies" and "was advised to work on home physical therapy to relieve pain associated with pelvic floor dysfunction." *Id.*

The ALJ next discussed Ramos's other allegations. The ALJ reviewed records from Dr. Ari Klapholz, one of Ramos's treating physicians from the NYU Langone Health System, and these records "noted that the claimant's hypothyroidism was clinically stable and likely resolved." *Id.* at 22, 70. The ALJ

considered that Ramos "received a diagnosis of carpal tunnel syndrome" and testing revealed "moderate right and minimal left carpal tunnel syndrome[.]" *Id.* Further testing in November 2020 "revealed full range of motion of the bilateral hands." *Id.* The ALJ observed that Ramos "attended physical therapy and used hand splints" and "took care of her two-year-old who weighed 39 pounds." *Id.*

The ALJ then considered agency opinions. She reported that R. Uppal, DO, J. Randall, M.D., M. Juriga, Ph.D, and K. Lieber-Diaz, Psy.D each opined or affirmed that Ramos's impairments were "non-severe" or "mild." *Id.* at 23. However, the ALJ determined that the "state agency opinions are not persuasive as the claimant has been on various medications, received physical therapy and consistent medical treatment for numerous impairments supported by objective tests and physical exam findings . . . [that are] more than slight abnormalities and significantly limit the claimant's ability to perform basic work activities." *Id.*

The ALJ next discussed the medical evidence. *Id.* The ALJ determined that while "the claimant suffers from multiple physical and psychiatric impairments . . . the overall record reflects no more than moderate findings[.]" *Id.* The ALJ emphasized that the record "simply does not contain evidence consistent with the extensive degree of reduced functioning alleged by the claimant." *Id.*

At step five, after considering Ramos's "age, education, and residual functioning capacity," and finding that Ramos would be "unable to perform any past relevant work," the ALJ concluded that Ramos could perform jobs such as sorter, price marker, and small parts assembler, all of which exist in significant numbers

17

in the national economy.  *Id.* at 24–25.  Accordingly, the ALJ concluded that Ramos was not disabled prior to the date of the decision.  *Id.* at 26.

## II.    DISCUSSION

### A. Legal Standards

#### 1.  Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the Commissioner "in the district court of the United States for the judicial district in which the plaintiff resides[.]"  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3) (incorporating the judicial review provided in § 405(g) for SSI).  The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by "substantial evidence."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (cleaned up)); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))).

The substantial evidence standard is a "very deferential standard of review."

*Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to 'substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review.'" *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (cleaned up)). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (emphasis omitted) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g). However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (alteration in original) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).

While weighing the evidence, an ALJ must avoid "cherry picking," thereby

"'inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source.'" *Mack v. Comm'r of Soc. Sec.*, No. 20-CV-2722 (RA) (SLC), 2021 WL 3684081, at *16, *adopted by* 2021 WL 3683628 (Aug. 17, 2021) (quoting *Artinian v. Berryhill*, No. 16-CV-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018)).  "'Cherry picked decisions do not satisfy substantial evidence standards because reviewing courts cannot conclude, under such circumstances, that adverse findings were based on evidence reasonable minds might accept as adequate to support a conclusion." *Id.* (cleaned up).

## 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 22 F.4th 353, 357 (2d Cir. 2022).  Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  "[T]he ALJ should consider not only whether Plaintiff was disabled at the time of the hearing, but also whether Plaintiff was entitled to disability benefits for any closed, continuous period . . . following the date of his claim." *Love v. Kijakazi*, No. 20-CV-1250 (EK), 2021

WL 5866490, at *5 (E.D.N.Y. Dec. 10, 2021) (quoting *Williams v. Colvin*, No.

15-CV-144 (WMS), 2016 WL 3085426, at *4 (W.D.N.Y. June 2, 2016)); *see also*

*Milliken v. Saul*, No. 19-CV-9371 (PED), 2021 WL 1030606, at *9 (S.D.N.Y. Mar. 17,

2021) ("A 'closed period' of disability occurs where a claimant is found by the

Commissioner to be disabled for a finite period of time which began and ended prior

to the date of the agency's administrative determination of disability.").

In assessing a claimant's impairments and determining whether they meet

the statutory definition of disability, the Commissioner "must make a thorough

inquiry into the claimant's condition and must be mindful that 'the Social Security

Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*,

722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).

Specifically, the Commissioner's decision must consider factors such as: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts;

(3) subjective evidence of pain or disability testified to by the claimant or others;

and (4) the claimant's educational background, age, and work experience." *Id.*

(citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential

evaluation process' to determine whether a claimant is disabled." *Estrella v.*

*Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R.

§ 404.1520(a)(4).  First, the Commissioner establishes whether the claimant is

presently employed.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed,

the Commissioner goes to the second step and determines whether the claimant has a "severe" impairment restricting his or her ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *Id.*; 20 C.F.R. § 404.1520(d).

If the claimant's impairment does not meet or equal a listed impairment, then the Commissioner continues to the fourth step and determines whether the claimant has the RFC to perform his or her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citing *Butts*, 388 F.3d at 383).  If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy.  *See, e.g.*, *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.  Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims*

*v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ,

unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop

the record in light of the essentially non-adversarial nature of a benefits

proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation

marks omitted).  As part of this duty, the ALJ must "investigate the facts and

develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at

111.  Specifically, under the applicable regulations, the ALJ is required to develop a

claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §

404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a

claimant's medical records and reports but also the duty to question the claimant

adequately about any subjective complaints and the impact of the claimant's

impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-

11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold

question.  Before determining whether the Commissioner's final decision is

supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be

satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's

regulations' and also fully and completely developed the administrative

record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12

(E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Hum. Servs.*, 685

F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez ex rel. Silverio v. Barnhart*, No. 02-

CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) (citing *Brown v.*

23

*Apfel*, 174 F.3d 59 (2d Cir. 1999) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.")).  The ALJ must develop the record even where the claimant has legal counsel.  *See, e.g.*, *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  Remand is appropriate where this duty is not discharged.  *See, e.g.*, *Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c. Assessment of a Claimant's Subjective Complaints

Assessment of a claimant's subjective complaints about his or her symptoms or the effect of those symptoms on the claimant's ability to work involves a two-step process.  Where a claimant complains that certain symptoms limit his or her capacity to work, the ALJ is required, first, to determine whether the claimant suffers from a "medically determinable impairment[ ] that could reasonably be expected to produce" the symptoms alleged.  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  Assuming the ALJ finds such an impairment, then the ALJ must take the second step of "evaluat[ing] the intensity and persistence of [the claimant's] symptoms," considering "all of the available evidence," to determine "how [the] symptoms limit [the claimant's] capacity for work."  *Id.* §§ 404.1529(c)(1), 416.929(c)(1).  In doing so, the ALJ must consider all of the available evidence, and must not "reject [ ] statements about the intensity and persistence" of the claimant's symptoms "solely because the available objective medical evidence does not substantiate [the claimant's] statements."  *Id.* §§ 404.1529(c)(2), 416.929(c)(2).

Instead, where the claimant's contentions regarding his or her symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the claimant's statements in relation to the objective evidence and other evidence, in order to determine the extent to which the claimant's symptoms affect his or her ability to do basic work activities. *Id.* §§ 404.1529(c)(3)–(4); *id.* §§ 416.929(c)(3)–(4); *see also* SSR 16-3.

While an ALJ is required to take a claimant's reports of her limitations into account in evaluating her statements, an ALJ is "not required to accept the claimant's subjective complaints without question[.]" *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). To the extent the ALJ determines that the claimant's statements are not supported by the medical record, however, the ALJ's decision must include "specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence," and the reasons must be "clearly articulated" for a subsequent reviewer to assess how the adjudicator evaluated the individual's symptoms. SSR 16-3p. The factors that an ALJ should consider in evaluating the claimant's subjective complaints, where they are not supported by objective medical evidence alone, are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received for relief of the symptoms; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's

functional limitations and restrictions as a result of the symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii); *id.* §§ 416.929(c)(3)(i)-(vii). The ALJ need not list "each of the seven factors" in her decision, as long as it shows she evaluated claimant's credibility "by considering all of the relevant evidence." *See, e.g., Lane v. Saul*, No. 18-CV-5523 (PGG) (OTW), 2020 WL 3965257, at *9 (S.D.N.Y. Mar. 16, 2020) (citation omitted), *adopted by* 2020 WL 1876325 (Apr. 15, 2020).

### B. Analysis

Ramos argues that the Commissioner's decision should be reversed and that the Court should either enter a finding that Ramos is disabled or remand the case for further proceedings because (1) the ALJ improperly favored record evidence that did not support a finding of disability and failed to develop the record; (2) the ALJ ignored the limitations attributable to Ramos and found she had the incorrect RFC; (3) the ALJ's determination that Ramos is able to work is not supported by substantial evidence; and (4) new evidence further supports Ramos's disability. Pl. Mem. at 15–25. The Commissioner counters that substantial evidence supports the ALJ's decision; the RFC finding is supported by Ramos's treatment records and history; the ALJ did not "cherry-pick" the record or fail to develop it; and the new evidence Ramos submitted is immaterial to her claims. Def. Mem. at 8–24. As discussed below, the Commissioner has the better of the arguments.

### 1. The ALJ Properly Developed the Record

Ramos argues that "the ALJ both cherry-picked and failed to develop the record." Pl. Mem. at 17. The Court will address these two arguments separately,

but because the duty to develop the record is a threshold issue, it will address this
issue first.

Ramos contends that, in two specific ways, the ALJ did not fulfill her duty to
develop the record. First, in relation to her degenerative disc disease, Ramos
argues that the ALJ should have asked about the "type of exercises [she] did at the
gym[.]" Pl. Mem. at 18. As the Commissioner correctly points out and Ramos does
not refute in her reply, however, the "ALJ cited records showing that Plaintiff's
forms of exercise included walking, riding bikes, performing strength training, and
doing exercise classes." Def. Mem. at 16–17 (citations omitted). The ALJ therefore
did not fail to develop the record regarding this issue—the information is in the
record.

Second, Ramos argues that the ALJ failed to develop the record because she
did not ask about Ramos's endometriosis or related symptoms during the hearing.
Pl. Mem. at 18. The Commissioner responds that "the ALJ reasonably considered
records of Plaintiff's treatment" and did not fail to develop the record because she
asked Ramos to describe all of her pain from the top of her head to the bottom of her
feet, and Ramos made no mention of pelvic pain. Def. Mem. at 17. Further, at the
end of her questioning, the ALJ asked Ramos: "[d]o you think that you have any
other conditions or any other factors that might affect your ability to work or
restrictions in some way that I haven't asked you so far?" AR at 246. Ramos again
made no mention of pelvic pain. *Id.* at 246–47. In these circumstances, the ALJ
had no additional duty to ask Ramos specifically about her pelvic pain, and her

general questions about the pain that Ramos experienced were sufficient.  *See e.g.,*
*Sarjeant v. Chater*, 165 F.3d 14, at *2 (2d Cir. 1998) (when ALJ "asked plaintiff if
she would 'like to tell me anything else that you think is important for me to know
in connection with your application,'" ALJ had provided plaintiff with "sufficient
opportunity" to testify about subjective complaints of pain).

### 2.  The ALJ Did Not Improperly Favor Record Evidence

Ramos argues that for each of her five identified medical conditions—long
COVID, degenerative disc disease, pelvic pain and endometriosis, carpal tunnel
syndrome, and major depressive disorder and generalized anxiety disorder—the
ALJ improperly favored record evidence while ignoring evidence of Ramos's
conditions.  The Court will address each condition in turn.

For long COVID, Ramos argues that because the ALJ noted "that the 'record
did not indicate a positive COVID test or positive anti body test," but "failed to
acknowledge record evidence that Ms. Ramos was given a 'presumptive' COVID
diagnosis in April 2022 and was later diagnosed with long COVID," she cherry-
picked the record.  Pl. Mem. at 17 (citing AR at 19).  Similarly, Ramos contends that
although the ALJ acknowledged her many complaints of long COVID, "the ALJ
discounted this evidence, without explanation, by pointing to instances in which
[her] pulmonary function tests came back normal[.]"  *Id.*  The Commissioner
counters that "the ALJ [] cited records regarding Plaintiff's history of COVID and
related treatment" and that "the ALJ thoroughly considered Plaintiff's symptoms,
including her treatment records and testimony regarding complaints such as

fatigue, brain fog, and increased heart rate." Def. Mem. at 15–16.

While Ramos is correct that the ALJ did not explicitly credit her presumptive long COVID diagnosis, that decision is not indicative of "cherry-picking" the record. The ALJ considered Ramos's "viral pericarditis, post-viral syndrome, and dysfunctional ANS" as well as various complaints of symptoms such as chest pain, shortness of breath, fatigue, dizziness, myalgia, and tachycardia, which Ramos identified as symptoms of long COVID. AR at 19–20. There is no evidence that the ALJ "cherry-picked" the record or disregarded Ramos's complaints of post-viral symptoms.

For her degenerative disc disease, Ramos argues that "the ALJ again discounted this evidence [of degenerative disc disease and moderate to severe canal stenosis, as well as repeated complaints of back pain] without explanation, because [she] reported going to the gym." Pl. Mem. at 18. Ramos points to record evidence stating that she "had to repeatedly stop exercising due to rapid heartrate and joint pain[.]" *Id.* The Commissioner counters that the ALJ considered all of the relevant evidence, which included Ramos's history of taking classes at the gym as well as results from physical examinations. Def. Mem. at 16–17.

The Court agrees with the Commissioner. The ALJ properly noted Ramos's reports of low back pain and weighed these reports against medical test results. AR at 21–22. While the ALJ pointed out Ramos's "moderate to severe canal stenosis" and other back issues, she also considered her physical exams and gym class attendance. AR at 22. Although the ALJ's decision did not explicitly mention

record evidence that Ramos had to stop exercising due to heart rate and joint pain issues, the ALJ clearly relied on both Ramos's complaints and test results in making her determination, and an "ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits us to glean the rationale of the ALJ's decision.'" *Cichocki v. Astrue*, 729 F. 3d 172, 178 n.3 (2d Cir. 2013) (citing *Mongeur*, 722 F.2d at 1040). The ALJ's rationale concerning the analysis of Ramos's degenerative disc disease is apparent from her decision.

Regarding her endometriosis diagnosis, Ramos argues that "[w]hile the ALJ acknowledged that [she] repeatedly complained of pelvic pain and was diagnosed with endometriosis, she dismissed this evidence by pointing out that Ms. Ramos 'made progress' in physical therapy, 'underwent medical management with Mirena IUD and progesterone therapies' and was 'advised to work on home physical therapy' to relieve her pelvic pain." Pl. Mem. at 18 (citing AR at 22). The Commissioner counters that "the ALJ reasonably considered the treatment record and Plaintiff's reports of pelvic pain in assessing an RFC for light work." Def. Mem. at 17.

The Commissioner prevails on this argument as well. The ALJ briefly noted Ramos's complaints of pelvic pain and her endometriosis diagnosis, even though she herself did not affirmatively mention this as a source of pain during the hearing. AR at 22. The ALJ explained that Ramos was prescribed medication, that physical therapies had been helpful, and that Ramos was "advised to work on home physical therapy[.]" *Id.* This finding does not indicate that the ALJ ignored Ramos's

30

complaints of pelvic pain, but rather that the ALJ weighed her complaints against the improvement she experienced from medication and therapy, and then determined that these symptoms did not prevent Ramos from completing light work.

Ramos makes a similar argument regarding her carpal tunnel syndrome. She contends that the ALJ acknowledged her diagnosis and that she "wore splints and attended physical therapy, yet discounted this evidence by pointing to several exams finding full range of motion and muscle strength in her hands[.]"  Pl. Mem. at 18–19.  Ramos argues that the ALJ "ignores and mischaracterizes record evidence wherein [she] consistently complained of bilateral hand and wrist pain[.]"  *Id.* at 19.  The Commissioner responds that the ALJ did not ignore or mischaracterize this evidence, but rather "acknowledged her reports of bilateral shoulder, arm, and hand pain and related difficulties, including her testimony that she could only carry 'snack foods or things like that.'"  Def. Mem. at 18 (citing AR at 19, 22).  Further, the Commissioner suggests the ALJ reasonably weighed this against Ramos's treatment history and examination findings.  *Id.*

The ALJ did not "cherry-pick" the record on this issue.  She observed that Ramos "cannot lift anything other than snack bags," that "she cannot write for more than 3 to 5 minutes, and she has occasional problems opening jars," but weighed these findings against other evidence, including that "she can reach overhead and out front and use her phone."  AR at 19.  Moreover, the ALJ considered Ramos's test results which, as of November 2020, "revealed full range of motion of the bilateral

hands [and] intact sensation to light touch of the median, ulnar, and radial nerves." *Id.* at 22. Nothing in this record suggests that the ALJ was selective in her assessment of this condition.

Finally, Ramos argues that the ALJ dismissed record evidence of her major depressive and generalized anxiety disorders, instead focusing on reports from therapy record notes indicating improved symptoms and "full affect." Pl. Mem. at 19. The Commissioner replies that the ALJ reviewed the treatment records and "did not 'dismiss' evidence of Plaintiff's anxiety and depression 'without explanation.'" Def. Mem. at 19–20.

Ramos's argument is again unavailing. She fails to point to evidence that the ALJ did not consider in rendering her decision. Instead, Ramos questions how the ALJ made her decision. In reviewing an ALJ's decision, however, the Court cannot question the decision-making of the ALJ unless "a reasonable factfinder would *have to conclude otherwise.*" *Brault*, 683 F.3d 443 at 448 (emphasis in original) (citation omitted). There is no basis for the Court to reach such a conclusion here.

In sum, there is no evidence that the ALJ cherry-picked the record or that she improperly favored information from the record that would require the Court—for any of these medical conditions—to conclude otherwise.

### 3. Substantial Evidence Supports the ALJ's RFC Finding

Ramos next argues that the ALJ ignored her limitations and found she had the incorrect residual functional capacity. Pl. Mem. at 19. The ALJ determined that Ramos had the RFC to perform light work "limited to frequent grasp, finger,

and feel[.]" AR at 18.  However, Ramos contends that this "is not supported by substantial evidence because it ignores evidence that [she] has difficulty standing or sitting for long periods and has limited use of her hands." Pl. Mem. at 19.  Ramos points out that "light work," under SSA regulations, requires "a good deal of walking or standing." *Id.* at 20 (citation omitted).  To that end, Ramos suggests the record "demonstrate[s] that she is unable to sit, stand or walk for long periods and has limited use of her hands." *Id.*  Ramos's argument focuses specifically on her physical limitations, not her mental limitations.

In response, the Commissioner reiterates some of the same arguments he made in response to Ramos's claim that the ALJ improperly cherry-picked the record.  He points to the ALJ's detailed analysis of Ramos's medical records and reports.  Def. Mem. at 9–21.  Because of this analysis, the Commissioner contends that "substantial evidence supports the ALJ's RFC finding, and Plaintiff fails to show that a reasonable factfinder would be compelled to assess greater restrictions based on this record, as is required under the substantial evidence standard of review." *Id.* at 15 (citing *Brault*, 683 F.3d at 448).

The Second Circuit has observed that moderate limitations are not inconsistent with RFCs allowing for light work.  *See, e.g.*, *Wright v. Berryhill,* 687 F. App'x 45, 47 (2d Cir. 2017) (upholding RFC determination allowing light work for individual found to have moderate exertional limitations due to severe mental impairments).  "An RFC allowing for an exertional limitation of light work can sufficiently and appropriately accommodate the capacities of individuals with both

moderate physical and psychological limitations, such as [Ramos]." *Rama v. Acting Comm'r of Soc. Sec.*, No. 22-CV-6928 (JLC), 2023 WL 8379265, at *17 (S.D.N.Y. Dec. 5, 2023). A plaintiff has the "duty to prove a more restrictive RFC," and the Court must "defer to the Commissioner's resolution of conflicting evidence[.]" *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (citations omitted).

There is no inconsistency in Ramos's determined RFC that allows for light work with additional limitations. The ALJ based her RFC determination on the record as a whole. Regarding Ramos's contention that she has limited use of her hands, the ALJ weighed these complaints against November 2020 physical examination findings that revealed full range of motion of Ramos's bilateral hands, as well as evidence that she used hand splints. AR at 22. Concerning Ramos's assertion that she is unable to sit, stand, or walk for long periods and is thus not suited to complete light work, the ALJ considered Ramos's testimony, but also observed that "the overall record reflects no more than moderate findings . . . and adequate physiologic functioning with mostly routine and conservative management . . . and simply does not contain evidence consistent with the extensive degree of reduced functioning alleged by the claimant." *Id.* at 23. "[T]he Court cannot reweigh the evidence in the record, which is essentially what [Ramos] has requested the Court to do." *Rama*, 2023 WL 8379265, at *17. In sum, the RFC is supported by substantial evidence.

### 4. Ramos's Argument that the ALJ Ignored Testimony from the VE is Misguided

Ramos separately argues that "[t]he ALJ [] incorrectly evaluated [her] ability

to perform other work." Pl. Mem. at 20.  Although this appears to be a
reformulation of the same argument about the RFC, the Court will briefly discuss
this contention.

In making this argument, Ramos describes the three hypotheticals that the
ALJ posed to the VE.  *Id.* at 21–22.  While two of the hypotheticals suggested
"frequent" grasping, fingering, and feeling, only the third inquired about
"occasional" grasping, fingering, and feeling.  *Id.*  Ramos argues that "the ALJ only
acknowledged and credited the vocational expert's testimony from the first
hypothetical."  *Id.* at 23.

This is an inaccurate assessment of the VE's testimony.  The ALJ asked the
VE about three different possible RFC determinations.  For each, the VE provided
an answer to show the existence of possible employment for an individual with that
RFC.  While the ALJ selected the RFC associated with the first hypothetical in her
decision, there is no indication that the ALJ ignored any of the VE's testimony.  Had
the ALJ selected the RFC mentioned in hypothetical three, then the ALJ would
have been guided by the VE's testimony that work in the national economy would
be eliminated.  However, the ALJ chose not to do so, and as described above, the
RFC determination is supported by substantial evidence.  *See Wavercak v. Astrue*,
420 F. App'x 91, 95 (2d Cir. 2011) ("Because we have already concluded that
substantial record evidence supports the RFC finding, we necessarily reject
[claimant's] vocational expert challenge.").

### 5. The Case Should Not be Remanded Based on Ramos's New Evidence

The Agostinelli Declaration, which Ramos submitted with her memorandum of law, attaches two exhibits with recent test results dated December 15, 2023 and January 26, 2024. Agostinelli Decl. ¶¶ 2–3. These two exhibits are records from medical testing conducted at the Mount Sinai long COVID clinic. Pl. Mem. at 24. The first exhibit lists "RMR Results" and "BMR/RMR Results." Ex. 1 to Agostinelli Decl., Dkt. No. 22-1. The medical findings section of these results indicates that Ramos's "[m]easured resting metabolic rate was ~40% higher (2572 kcal/kg) than the predicated normal value for this patient (1818 [] kcal/kg). This proxy test may provide evidence of mitochrondrial hyperactivity." *Id.* at 2. The second exhibit lists results from a neurocognitive assessment. Ex. 2 to Agostinelli Decl., Dkt. No. 22-2. The overall results indicate that Ramos's combined score totaled 74 out of 200, a score which shows "likely" presence of cognitive impairment. *Id.* at 1. The results are also broken out by individual test, with some results indicating that there is unlikely to be dysfunction, while others indicate that it is possible there is dysfunction, or that dysfunction is likely. *Id.* at 1–2. In particular, Ramos's results for "Stroop" under "Executive Function" indicated likely dysfunction. *Id.* at 1. Similarly, both test results in the "Memory" category indicated likely dysfunction. *Id.* at 1–2.

Under 42 U.S.C. § 405(g), the Court may remand a case "only upon a showing that there is *new evidence* which is *material* and that there is good cause for the failure to incorporate the evidence into the record in a prior proceeding[.]"

36

(emphasis added). *See also* 20 C.F.R. §§ 404.970; *Drysdale v. Colvin*, No. 14-CV-1722 (SN), 2015 WL 3776382, at *9 (S.D.N.Y. June 16, 2015). "Evidence is new if it did not exist before the ALJ decision and it is not merely cumulative of evidence already in the record." *Id.* (citing *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988)). "Evidence is material where 'it relates to the period on or before the date of the [ALJ] hearing decision,' is probative, and there is 'a reasonable possibility' that it would have influenced the ALJ's decision." *Id.* (citing *Tirado*, 842 F.2d at 597). "Documents generated after the ALJ rendered a decision are not categorically barred so long as the documents are relevant to the time period, before the ALJ's decision, for which benefits were denied." *Id.* (citing *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004)). "New and material evidence will not warrant remand if it 'does not add so much as to make the ALJ's decision contrary to the weight of the evidence.'" *Id.* (citing *Rutkowski v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010)).

In this case, it is undisputed that the exhibits attached to the Agostinelli Declaration are new, "because they were not before the ALJ[.]" Def. Mem. at 23. Additionally, the Commissioner does not contest that there was good cause for this evidence not to have been submitted previously. However, the parties dispute whether the new evidence is material.

Ramos argues that the test results in Exhibit 1 "provide further evidence of long COVID[.]" Pl. Mem. at 24. For the neurological test results in Exhibit 2, Ramos contends that this "shows that [she] sustained no marked improvement since first experiencing these symptoms and confirms the severity and continuity of

[her] impairments that existed during the disability period." *Id.* at 25 (citation omitted).

The Commissioner counters that the "newly submitted evidence . . . is not relevant to Plaintiff's functioning during the period for which benefits were denied," and that Ramos has "failed to show a reasonable possibility that it would have influenced the Commissioner to decide her application differently." Def. Mem. at 23–24.

In her reply, Ramos again emphasizes that "this new testing confirms the severity and continuity of [her] impairments that existed during the disability period." Pl. Reply at 3. The Court will assess both of the new medical test results in turn.

While the test results included in Exhibit 1 "may provide evidence of mitochrondrial hyperactivity," Ramos has not demonstrated that this is material. First, it is not clear that this is "relevant to the time period[] before the ALJ's decision[.]" *Drysdale*, 2015 WL 3776382, at *9. Mitochondrial hyperactivity could be a new symptom that arose in the year-and-a-half between the ALJ's decision in May 2022 and the date of this test in December 2023. Ramos argues that this result "provide[s] further evidence of long COVID and show[s] that [she] consistently sought treatment for her condition." Pl. Mem. at 24. "Although evidence that postdates the ALJ's decision is not irrelevant *per se*, the burden is on the claimant to show that the criteria under § 405(g) and *Tirado* are satisfied." *Wilbon v. Colvin*, No. 15-CV-756 (FPG), 2016 WL 5402702, at *4 (W.D.N.Y. Sept.

28, 2016) (citations omitted).  Ramos's "conclusory" statements do not meet this burden.  *See id.* at *4 n.5.  Her arguments do not demonstrate that the test result is material.

Second, and perhaps more importantly, Ramos has failed to argue how there is "a reasonable possibility" that this test result would have changed the ALJ's decision.  *Drysdale*, 2015 WL 3776382, at *9.  The ALJ's decision carefully reviewed Ramos's history of complaints relating to complications from COVID-19, including discussion of trips to the emergency department, chest pain, shortness of breath, tachycardia, fatigue, and other symptoms.  AR at 19–21.  The ALJ weighed these symptoms against Ramos's testing and examination results, which on various occasions included "improved symptoms" and testing "generally within normal limits."  *Id.*  Particularly given the equivocal "*may*" language in Ramos's test result, which does nothing but show that this "*may*" be an indication of long COVID, there is no reason to think that there is a reasonable possibility that this single test result would have changed the balance of the ALJ's detailed decision.

Exhibit 2 indicates Ramos's recent neurological test results.  Few cases are remanded on the basis of new evidence that is related to mental developments.  *See Drysdale*, 2015 WL 3776382, at *10.  This is because it is difficult to "distinguish[] between new evidence which 'reflects the severity of the plaintiff's impairment as it existed during the time period for which benefits were denied' and that which 'represents new impairments which would not have affected the decision below, and which would be better considered in a new application for benefits.'"  *Id.* (quoting

*Hernandez v. Sullivan*, No. 91-CV-1836 (LBS), 1992 WL 315637, at *3 (S.D.N.Y. Oct. 22, 1992)).

While Ramos's neurological test results reveal that she is "likely" impaired as of January 2024, these results, from more than a year-and-a-half after the ALJ issued her decision, do not shed light on the period at-issue—from March 31, 2020 until the date of the ALJ's decision on May 26, 2022.  It is certainly possible that Ramos's condition has worsened since the ALJ's decision.  However, "[t]he Court finds that [these results] do[] not necessarily disclose the severity and continuity of impairments existing before the ALJ's decision, make the ALJ's decision contrary to the weight of the evidence, or contain a reasonable likelihood of influencing the ALJ's decision," and therefore remand is not warranted because of this new evidence.  *Drysdale*, 2015 WL 3776382, at *12 (citing *Tirado*, 842 F.2d at 597). Nothing in this conclusion, however, precludes Ramos from seeking benefits as of a more recent period after the ALJ's decision on the basis of this new evidence.

### III.    CONCLUSION

For all the foregoing reasons, Ramos's motion for judgment on the pleadings is denied.  The Clerk is respectfully directed to enter judgment for the Commissioner of Social Security.

**SO ORDERED.**

Dated:  New York, New York
        August 13, 2024

JAMES L. COTT
United States Magistrate Judge